No. 23,098.

THE STATE OF KANSAS, ex rel. CHARLES B. GRIFFITH (substituted for Richard J. Hopkins), Attorney-general, *Plaintiff,* v. THE ANTHONY WHOLESALE GROCERY COMPANY et al., including THE H. D. LEE MERCANTILE COMPANY, and THE SAMUEL E. LUX, JR., MERCANTILE COMPANY, and THE PITTSBURG WHOLESALE GROCERY COMPANY, *Defendants.*

### SYLLABUS BY THE COURT.

MONOPOLIES—*Combinations in Restraint of Trade—Evidence.* In a proceeding in quo warranto in which the state alleged that certain wholesale grocery companies had entered into and promoted an unlawful combination to fix and maintain prices of merchandise, restrain trade and prevent competition, evidence was taken before a commissioner, who, after hearings, made findings of fact and conclusions of law to the effect that the charges made by the state had been sustained. On exceptions of defendants that the evidence does not sustain the findings and conclusions made and upon an examination of the evidence, it is determined that defendants entered into an unlawful combination and that their acts in furtherance of the purposes of the combination amounted to a violation of the antitrust statute, which renders them subject to the penalties of the statute.

Original proceeding in quo warranto; JOHN A. HALL, commissioner. Opinion filed April 11, 1925. Finding for plaintiff; judgment reserved.

*Charles B. Griffith,* attorney-general, and *John G. Egan,* assistant attorney-general, for the plaintiff.

*D. R. Hite, T. M. Lillard, Bruce C. Hurd, O. B. Eidson, John S. Dean, Harry W. Colmery,* all of Topeka, *Thomas L. Bond,* of Salina, and *C. O. Pingry,* of Pittsburg, for the defendants.

The opinion of the court was delivered by

JOHNSTON, C. J.: This was an original proceeding in quo warranto brought in the name of the state by the attorney-general, in which he alleged that the Anthony Wholesale Grocery Company and 37 other corporations and partnerships engaged in the wholesale grocery business in Kansas have maintained and are maintaining an unlawful trust and combination to prevent competition and control the prices, terms and conditions for the sale of groceries in violation of the laws of the state, and asking that each be ousted and prevented from carrying on such unlawful business, and for the imposition of appropriate penalties. Upon an agreement as to the payment of penalties, a judgment has been rendered against thirty-five of the corporations and firms sued, but the H. D. Lee Mercantile

Company, the Samuel E. Lux, Jr., Mercantile Company and the Pittsburg Wholesale Grocery Company, still contending with the state, the action has been continued as to them. Hon. John A. Hall was appointed as a commissioner of the court to hear evidence on the issues formed by the pleadings and make findings of fact and conclusions of law. Evidence was taken and the commissioner has filed his report, in which he finds that the contesting defendants and each of them had joined in forming and maintaining an illegal combination of capital, skill, and of doing acts alleged by plaintiff which are condemned by the antitrust statute, and hence each is subject to penalties to be determined by this court. Each of the defendants excepts to the findings and conclusions of the commissioner, insisting that the evidence does not warrant the findings of fact or the conclusions of law. Much of the testimony offered to sustain the charges of wrongdoing by the defendants centered about an organization designated as the Missouri and Kansas Wholesale Grocery Association, organized about May 20, 1913. This association included in its membership and supporters the thirty-eight defendants sued, and a few others whose places of business were outside of the state and who were not sued because summons could not be served upon them within the state. The association had no constitution or by-laws, but had a secretary and treasurer, Harry E. Sloan, who was directly in control of the organization. The expense of maintaining the organization with its various activities was met by assessments upon its members and those deriving benefit from its existence and operations. The secretary gathered information from the members of the business done and methods employed, he issued many bulletins and circulated them among the members and contributors, wrote letters to them giving advice as to coöperation, customs, practices and prices, and kept the members in touch with each other. With other officers, he called meetings of the association, where these subjects were discussed and courses of action determined. The ostensible purposes of the association were:

"*First.* To foster and promote a feeling of fellowship and good will among its members and on broad and equitable lines to advance the welfare of the wholesale grocery trade of the United States.

"*Second.* To oppose improper methods and illegitimate practices inimical to the right conduct of business that honest and open competition may prevail.

"*Third.* To promote harmonious relations among manufacturers, wholesalers and retailers in order that food products may be placed in the hands of consumers at the lowest possible cost.

"*Fourth.* To assist in the enactment and enforcement of federal and state pure-food laws that in their operation shall deal justly with the rights of consumers and the trade, and of effective weights and measures statutes for the protection of the public.

"*Fifth.* To promote the adoption and enforcement throughout the United States of uniform laws upon commercial subjects.

"*Sixth.* To disseminate useful information and maintain high standards of education among members with respect to the scientific and practical features of their business.

"*Seventh.* To have business conducted upon lawful and proper lines, and to correct evils, including 'schemes,' 'deals,' 'lotteries,' 'premiums,' and the subsidizing of jobbers' salesmen.

"*Provided,* That in the efforts of the association to accomplish these ends, no action shall be taken that will tend in any manner whatsoever to fix or regulate prices or in any way operate in restraint of trade."

The avowed purposes of the association were unobjectionable. They included purposes to foster and promote a feeling of fellowship and good will among its members; to oppose improper methods and illegitimate practices inimical to the right conduct of business, in order that honest and open competition may prevail and that food products may be placed in the hands of consumers at the lowest possible cost; to assist in the enforcement of federal and state pure-food laws, disseminate useful information and maintain high standards of education among members with respect to the scientific features of their business, and also added, as we have seen:

"That in the efforts of the association to accomplish these ends no action shall be taken that will tend in any manner whatsoever to fix or regulate prices or in any way operate in restraint of trade." .

The testimony which related mainly to transactions and practices occurring in 1918 and afterwards, to and including 1920, covered a wide range of activities, including bulletins, letters, speeches, discussions, reports, and from it all the commissioner concluded that the three defendants during a named period in 1920 were in a trust and composed a combination of capital, skill and acts for the following purposes:

"1. To create and carry out restrictions in trade and commerce within the state of Kansas.

"2. To carry out restrictions in the full and free pursuit of the business of buying and selling groceries within the state of Kansas.

"3. To increase the price of groceries and merchandise to the public within the state of Kansas.

"4. To prevent competition among the members of the Missouri-Kansas Wholesale Grocers Association and the H. D. Lee Mercantile Company in

The State, *ex rel.*, v. Anthony Wholesale Grocery Co.

the purchase and sale of groceries and merchandise within the state of Kansas.

"5. To fix standards and figures whereby the price to the public should be controlled and established as to groceries and merchandise within the state of Kansas.

"6. To make, enter into, execute and carry out obligations through meetings, reports and bulletins to preclude a free and unrestricted competition among themselves in the sale of groceries and merchandise within the state of Kansas."

These findings were followed by others with reference to the connection of the defendants with the association, the contributions made by them towards its maintenance and the conduct and participation of each.

We will first consider the purposes of the association as an organization as shown by bulletins, letters, statements and the conduct of officers, and those taking a more or less active part in promoting its plans and purposes. The bulletins of Secretary Sloan were sent to members and contributors at irregular intervals of from one to three weeks. These covered a great variety of subjects, including market conditions; necessity for harmony and coöperation among the members; suggestions of prices to be charged for several articles; admonitions as to keeping prices up so as to secure profits and against the cutting of prices; excoriations of the actions of the food administration and fair-price committees acting for the federal government; calls for and reports of meetings of the association; appreciation of his advance of salary from $7,500 per year to $12,500, with a bonus of $5,000 for the preceding year, designed to be collected by increased assessments of members and contributors to the association. A few of the excerpts from his bulletins, letters and reports, as well as statements of other participants, follow. In a call for a meeting he said:

"I think this is a very important meeting, and I think that all of the jobbers of Missouri and Kansas should attend it. We are not calling a general meeting, because it is by nature a zone meeting of those who are interested in general conditions as pertain to the Missouri river. I think that everybody should attend. Somebody must establish a life-saving station for the wholesale grocer. It goes without saying that some have been disposed to unload canned tomatoes, canned salmon, and even canned corn, and are urging sales upon free deals, freight allowance, and following the gamut of general demoralization."

In another bulletin reference is made to the sale of tobacco, and of salesmen whose strength lies in price alone, and he follows:

"Now it is an obvious fact that one man's Star tobacco is as good as another's, and price will take the business. It is also equally obvious that no

house or salesman can make a sou markee in net profit by selling listed goods at a cut price. Therefore the salesman who is building for the future will doubtless face the time when he will be compelled to yield a certain volume of business to be the cutter. It has been so in the past and will be so in the future."

In another he said:

"Milk fever is accompanied with severe pains and throbbing in the head, flushing in the face, thirst, heat and dryness of skin. There seems to be an epidemic of it among the wholesale grocers in Kansas City. The severe pains are caused chiefly by the matter of price. Carnation milk, for instance, is being sold at $7 per case. That causes the pains to prevail both among those who have it and those who are liable to catch it, because it is very contagious. The flushing of the face occurs when you ask a sufferer wotenell he does it for. Thirst prevails because there isn't anything any more to quench it with except a little water. The pulse is full (lucky pulse), the tongue furred, bowels costive, and light and sound are painful. It is indeed true that the sound of the price is extremely painful. The best treatment consists in cooling saline purgatives and good ventilation."

A member of the association asked the secretary to send certain classifications showing what items should be one per cent and what ones two per cent. The secretary responded, saying:

"Complying with your request of the 19th, I am sending you twenty-five copies of the latest classification, and upon which all jobbers in this territory are working."

Speaking of sugar and a resentment of the actions of federal attorneys and fair-price committees in telling them how to run their business, as to sugar he said:

"The only well-established market cost which seems at this writing to prevail is that of the cane refiner's; namely, $15 f. o. b. refinery. On this basis granulated sugar is sold to the retail trade at $16.75 f. o. b. It would be easy to get 20c. for it, but it is sold on a 'reasonable' basis. The retailer is selling it at 19c. to 20c. to the consumer. Where jobbers were driven in desperation to pay 16c., 17c. and 18c. for sugar, they have simply added a fair profit to the cost."

In another part of the bulletin he said:

"Based upon the cost to-day of granulated sugars, actual sales of which are booked by refiners at $15 f. o. b., the market is as follows: Based on granulated $16.75 Missouri river, the difference in freight rates figures as follows: Salina, Arkansas City, Emporia, Fredonia, Hutchinson, Junction City, Manhattan, McPherson, Topeka, Wichita, Winfield and all points taking a rate of 65.8—granulated, $16.85. Missouri river points and all markets taking a rate of 57.3—granulated, $16.75. Dodge City—granulated, $17.00. Concordia—granulated, $16.90. This price is based upon the margins set by the

The State, *ex rel.*, v. Anthony Wholesale Grocery Co.

fair-price committee. Straggling lots of southern and other higher-cost sugars must be figured on their own basis."

He further tells the members that a certain company has pinched off the jobber's profit on Jello and advises them that they do not allow this to pass without protest.

As to Cream of Wheat he suggested:

"You can lead a horse to water, but you can't make him drink. You can suggest, but your suggestions may fail to carry conviction. An article which may be designed to be forced through your hands on a margin less than the cost of handling is apt to meet a barrier. A manufacturer must feel ashamed of his brand if he doesn't feel that it should pay its fair proportion of the cost of distribution. Either that or he is afraid of it in competition. Cream of Wheat costs $8.10. The least it should bring is $9.25. Suggestions seem to be in order."

In another bulletin reference is made to canned goods and the sixty-day guaranty against swells. He tells them that the sixty-day limit should be enforced, and that:

"Nothing which was ever adopted has served so well its purpose as the sixty-day limit, and if you have any inclination toward cold feet or carelessness on this proposition, I advise you to tighten up and make the rule rigid. Use the sticker."

In the sticker it is stated that no credits will be given after the expiration of sixty days, and no goods returned without written authority from the dealer.

In reference to the action of the federal authorities he calls attention to a cartoon in the *Saturday Evening Post,* in which he says that:

" 'Honest business' is there represented by a splendid milk cow stampeded and bawling in terror while pursued in frenzy by demagogues, red agitators, tax collectors, radical press and parlor bolshevik relentlessly driving her as she plunged over the hill to certain doom and destruction, while the cunning fox representing the 'profiteering business' lies snug behind a protecting rock slyly winking his eye as he feasts on a big fat goose. I hope the head price-fixer and all the little price-fixers, as well as all the pallbearers who are restlessly wandering around with corpse of the Lever act to instill fear in the hearts of honest business and break down the morals of the commercial world, will see that cartoon and profit thereby."

In a call for a meeting the secretary stated:

"You will find enclosed a blank for return of your outstanding accounts for January business. I would consider it a personal compliment if every house receiving this request would comply. Please pass the blank on to your credit department with instructions to fill it out and mail it to this office. Our *Monthly Financial Bulletin,* under the caption of 'Dry Figures,' we find is

eagerly sought and carefully read, and each house can make it more complete and of greater value by sending in their figures. Comment and suggestions are also solicited. I am asking, further, on this blank, for your stock turn-over during the year of 1919. I hope to hear from all."

One of the defendants responded, stating that—

"Enclosed you will find financial report as per your request."

That company was written by the secretary, stating:

"Last month you failed to send a report of your outstanding accounts. Would it be asking too much to have you fill out the enclosed blank and mail it to me, covering January business? You understand that I am not trying to mix in your private affairs, and I don't think you think so, but I do find these comparative reports are of great interest all over the country and I am anxious to have a report 100 per cent pure on January."

In reply the company stated in a letter:

"This is in reply to your letter of February 3 asking for our report. Now, I sent you this report yesterday and wish to say that we are always willing to coöperate with you. We are taking a great deal of interest in this and want to tell you that we will be at the meeting February 12 and get better acquainted."

In a report of an address made by the secretary of a meeting, the method of dealing with outstanding accounts was treated. It was said:

"The method we pursue in our credit men's meetings is to take up the names of offending customers who are chronic infringers on the discount limit. If we find that some house is selling a certain customer we are having trouble with, we bring up the name of that customer, find out who are selling him. If we find three or four houses selling him we will stop this customer from taking excess discount or excess time."

With reference to the method of allowing discounts, the speaker further said:

"After talking the matter over it was considered best to bring this before the general meeting and to ask of you a reaffirmation of the principles with regard to the terms and discounts that had been previously adopted by this association, to the end that if there had been any slipping that we should go back to our sane basis."

In respect to the price fixing of federal authorities, the president remarked at a meeting:

"It seems to me, gentlemen, we can't get any definite basis on this sugar proposition. The best thing to do is to do what we have been doing—go along and do the best we can—let each one interpret these rules for himself. If anybody has more sugar than he can handle at a profit his neighbor will doubtless be willing to take it off his hands."

In respect to handling corn products, reference was made by a speaker to the fact that the jobbers in the states of Texas, Arkansas and Oklahoma sold without restrictions when they came into Kansas. The reply of the secretary was:

The Oklahoma jobbers tell me they handle corn products which they buy on the old scale list and they don't realize over 7 per cent profit on it. The line between Arkansas and Oklahoma, and Missouri and Kansas divides two selling departments of the corn products company; one is handled by one man, one handled by the other. The system is different. In this northern territory we buy on the zone system. We buy at a list price. Jobbers up in this territory take the profit that is allowed on the list; that makes 10 per cent and 3½ per cent where you are making 7. This is one thing I have up in correspondence now, suggesting that if it is good for the North it must be good for the South.

"Mr. Crane: Are Missouri and Kansas satisfied?

"The Secretary: Absolutely."

In another bulletin the members were told:

"Cane sugar cannot be sold at less than a 15c. cost basis, and your Eastern sugars must of course be sold on 16c. cost basis. Ain't it L? Each jobber, therefore, at the present time must figure out his selling price and see that he makes a reasonable profit. Uniformity cannot prevail when the situation changes with the arrival of each car of sugar."

In reference to sugar, a bulletin referred to a zone meeting to be held which members were invited to attend. In it the secretary stated:

"That in case you were unable to attend, I will issue a bulletin following the meeting which you will understand will give an outline of the decision arrived at there. I thought I would advise you of this so that if anything may come to you the latter part of the week you will understand it is based upon this conference, although of course it would be better if you could personally attend."

Smithmeyer, president of the association, was president of the Theo. Poehler Mercantile Company, and in a letter addressed to the managers of branch houses of the Theo. Poehler Mercantile Company at Emporia and Topeka he referred to a meeting which had been held the day before, in which he said:

"So many different prices from various sections were reported that it was impossible to satisfy everybody in regard to selling prices. So it was deemed best to try and make a uniform price, at least in this particular zone, of $18 per bag, f. o. b. Missouri river basis, and we believe that most of the jobbers interested in this particular territory will be billing sugar on this basis. . . . In this mail we are inclosing copies of suggested selling prices on canned fruits and vegetables; also on a few dried fruit and bean items. You will note that

26—118 Kan.

we will have to change a few items on which we are either too high or too low, and we expect to go over our books to-day and to-morrow and make the necessary changes in order to be in line with our competitors."

The president stated in another letter, in respect to the secretary's salary, that:

"In view of the fact that this past year Harry has enabled us, through his efforts and advice, to realize some handsome profits on several important items, it seems to me that we should show our appreciation by giving him a bonus, for the current year, of $5,000. I also believe that for next year he should be put on a salary basis of $15,000 per year."

In a letter to another grocer the president stated in relation to the compensation of the secretary:

"I am quite sure that you know enough about association work to understand that if we are working in harmony and everything is going along nicely that all of us will be much better off than if the opinions are divided. I cannot help but think that the assessments for association expense are, after all, but a slight matter. As long as we are able to work together we can accomplish a good deal."

In the same letter he stated:

"While one or two of the larger houses at Kansas City have not enrolled as members, I find that they are all contributing toward the expense of the association. In fact, I know positively that two of them pay regularly $50 every time that there is an assessment made. So I thought I would tell you this so that you may know all of the Kansas City houses that amount to anything are affiliated anyway with our Missouri-Kansas Association."

In another letter the president, speaking of the increase of salary for the secretary, said:

"There is no denying the fact that through his efforts and advice we have been able to secure a much better margin on quite a number of items—and the principal one of which, of course, is sugar—than we would have if he had not almost insisted on our asking a profit over replacement values. Of course you know all about this, and there is no need of my going into this matter with you in a letter. . . . Now, Brad., you know what we must strive for and try to maintain is harmony in our organization, for, after all, the salary proposition and possibly a few extra assessments during the year do not amount to much. As long as we can maintain a good and harmonious feeling among all of our members and also have our secretary feeling that he is appreciated, we can accomplish something. So I feel quite sure that unless you object very strongly that we will have no trouble in convincing them that they are getting this association service on a mighty cheap basis. The expense will not amount to 1c. per bag on sugar, and I do not anticipate great objections from anyone regarding a few extra assessments."

In a letter by one of the managers of the Theo. Poehler Mercantile

The State, *ex rel.*, v. Anthony Wholesale Grocery Co.

Company to another manager of a branch house of the same company, with reference to putting new prices into effect, he wrote:

"Don't you think we are making a mistake, however, in not getting our pineapple prices in line with what our competitors are getting? Fred will recall that we practically promised these other fellows at the time that we would line up with these pineapple prices, and it looks to the writer that we are apt to get in bad with these friendly competitors if we break faith with them by not lining up. There were some other items also on which we agreed at the Kansas City meeting to put up our prices, but on which it seems Lawrence decided afterwards not to raise its prices."

In another letter of the same writer, with reference to a meeting which had been attended by him and the president, he stated:

"At that time we had occasion to 'compare notes' with some of these other jobbers, and we found that our prices on pineapple were way too low as compared with those being quoted by our competitors. Mr. Smithmeyer and the writer made a note of these differences and decided to raise our prices in line with those shown by the new Topeka price-book pages."

In a bulletin of the secretary, reference is made to a pancake flour and the discounts to be allowed on it. Reference was made to a letter which expresses appreciation for the discount of 15 per cent to be deducted at the time the invoice was paid:

"All pancake manufacturers are allowing 2 per cent with the exception of the manufacturers of 'Aunt Jemima.' . . . If you recede from your former discount terms it will simply mean that every institution will do likewise, and the wholesale grocery trade will be penalized the exact difference in discount terms."

There was also in the bulletin a statement with reference to price cutters. It was said:

"The customer who is unreasonable in his views is of course an undesirable one. The sooner he is eliminated from the calling list of the salesman the better. Those making unjust claims, abusing their credit, or those who are not fair in their purchases, continually playing one jobber against another, are all undesirable. While there will always be some jobbers willing to gamble a little on these, yet as time goes on their numbers will grow less."

The president stated, in a meeting, that the secretary had succeeded in cutting down the percentage of outstandings very materially. He said:

"The monthly reports are a great help and ought to be an inspiration to all of us to do still better in way of prompt collections. The retailers will be benefited if they are advised to settle two or three times each month and take advantage of discounts. In former years some of the houses have allowed so-called 'harvest terms.' I think this practice tends to demoralization

and should not be started this season. You will all sell just as many goods on regular terms."

In a report of a meeting, resolutions passed, among other things, declared:

"That this association records itself in favor of the following allowances:

| | |
|---|---|
| No. 2 labels | $2.00 per M. |
| No. 2½ and No. 3 labels | 2.50 per M. |
| No. 10 short length labels | 2.50 per M. |
| No. 10 full length labels | 4.50 per M." |

At a meeting held, one of the speakers, it is reported, stated with reference to tobacco:

"Just now there is a scourge of the tobacco bug. Why it is so the most eminent doctors of business disagree. No sovereign remedy has as yet been discovered, and it continues to blight and kill the profit account. Those who contract this disease suffer fearfully, and the more so because it is in a measure self-inflicted. While there seems to be no permanent cure, yet there is a sure preventive. That preventive is to simply stick to list. Those who adopt it are happy, healthy, wealthy and wise. There was one little thing which came into universal favor the past year and which I have been told saved a great deal in time and trouble and money. I refer to the little sticker 'Guarantee Against Swells,' which has done so much to curb the return of outlawed canned goods and limited liability to sixty days."

In another report reference was made to the monthly comparison of outstandings published. It was said:

"It is a feature well worthy your support, and I hope that every house will respond to the call and fill out the necessary blank each month. These reports and the bulletins carrying them are widely read throughout the country, and the local associations of many states are engaged in exactly similar work as are we. Thus it brings to bear an enormous country-wide pressure on the wholesale grocery business to establish its transactions and terms of payment closer and closer to a cash basis, and as time goes on this feature of your association work will prove to be of recognized value to you all."

In a bulletin report was made of an annual meeting at which upwards of 85 per cent of the membership was present, and where it was unanimously voted—

"That as a testimonial of his services the past year, a cash bonus of $5,000 be given to our secretary, Harry E. Sloan, and that his salary for the present fiscal year be increased to $12,500."

It was further ordered that a distinct assessment be made upon each member for the purpose of raising the bonus.

Some effort was apparently made to conceal any action which might be considered as a violation of the antitrust law. The pres-

The State, *ex rel.*, v. Anthony Wholesale Grocery Co.

ident asked one of the speakers in respect to taking individual action in communications that passed between the different jobbers. The speaker responded:

"One man can't conspire, and two can. Two or more people together asking a certain manufacturer for anything might be considered in restraint of trade and as coercion. Individually you can do anything you want to, collectively you can't."

The president responded:

"It seems to me, then, to be a clear case of doing the necessary thing at the proper time, and unnecessary as well as unwise to pass a resolution or take any concerted action. We ought to all understand the matter sufficiently now to take proper action at the proper time."

In a bulletin relating to sugar and of the action taken at a meeting it was said:

"The future looks none too bright to me, although I am not as well posted as others. The full discussion we deem best not to reproduce, nor take up your time or the space in this report. Most of you heard it and the balance have good imagination."

In another report made by the secretary of an annual meeting he said:

"Policies are launched and ideas are reduced to concrete form. Individual action for the benefit of the whole is crystallized into harmony simply from the fact that men grow to understand each other. . . . There is still some important aftermath which will be passed on to you in due time, and of course those who were deprived of the privilege of personal presence will understand that there was much discussion which could not be covered in this report, and I would suggest to those that they take the opportunity of interviewing their neighbors who did attend."

The president, in writing a letter relating to the action of the association, stated:

"I do not care to go into details in a letter, and of course you will understand my reasons for not doing so, but I suggest that you refer this matter to your son Lee. I suggest doing this, inasmuch as Lee has attended a number of the meetings and is probably more familiar with what has occurred during the last six or eight months in the way of the activities of our association."

In a letter to another the president, after discussing what had been accomplished through the effort and advice of the secretary, said:

"Of course you know all about this and there is no need of my going into this manner with you in a letter."

At a meeting the president stated:

"Any further questions? If not, we will now go into executive session, and I would request that all nonmembers retire for the time being."

Among other things, it was shown that the association took concerted action to drive five packing companies out of the grocery business. It appears that an action was brought by the United States in the supreme court of the District of Columbia against these companies to enjoin them from doing a number of things, including the carrying on of the wholesale grocery business. By consent of the parties, a decree was entered which recited that the defendants asserted innocence of any violation of the law, but not desiring to be in a position of antagonism to the government, stipulated that the decree might be entered enjoining the carrying on of the wholesale grocery business on condition that their consent should not be considered as an adjudication that the defendants had in fact violated any law of the United States. After the rendition of the consent decree the packing companies withdrew from the wholesale grocery business. While steps taken to eliminate competitors and limit competition generally should be regarded as contrary to law, not much can be built on this feature of the case, since the judgment enjoining the companies from selling groceries has been rendered. To some extent it carries the implication that they were wrongfully engaged in that business and that the association should not be condemned for opposing a wrong, even though it might result in benefit to its members. Its efforts in that behalf did tend to show concerted action among the members of the association. There was considerable more evidence of like import to that stated, but enough has been quoted to show beyond cavil that the association was a combination, that its plan and purpose was designed to and did operate to restrict trade, it did operate to fix and maintain prices of merchandise, and prevent competition, to the prejudice of the public interest and in violation of the antitrust statute. (R. S. 50-101 and succeeding sections.) The validity of this statute has been considered and upheld. (*The State v. Smiley*, 65 Kan. 240, 69 Pac. 199; *The State v. Wilson*, 73 Kan. 334, 80 Pac. 639, 84 Pac. 737.)

It is argued that some of the purposes of the association, as well as those advocated in the bulletins, were wholesome and useful. It is said that the association aided the government food administra-

tion, in that its rulings were given publicity and were promulgated through the bulletins of the secretary, and that this aid so given was acknowledged by federal officers. The avowed purposes of the association were legitimate, and doubtless some of its plans and practices tended to correct trade abuses and in others the members may have been actuated by good motives. However, good motives, or that some good resulted from the action of the combination, do not serve to exonerate parties who do acts prohibited by the statute. In *International Harvester Co. v. Missouri*, 234 U. S. 199, it was said:

"It is too late in the day to assert against statutes which forbid combinations of competing companies that a particular combination was induced by good intentions and has had some good effect." (p. 209. See, also, *Armour Packing Co. v. U. S.*, 209 U. S. 56; *Standard Sanitary Mfg. Co. v. U. S.*, 226 U. S. 20; *Thomsen v. Cayser*, 243 U. S. 66.)

In regard to coöperation with and help rendered to the United States food administration, the commissioner has found, and not without evidence, that activities of the association were not in harmony with the federal authorities nor designed to aid in enforcing their regulations or to assist in the protection of the public; but, on the other hand, they constituted concerted unlawful action on the part of those supporting the association, including the three defendants, to circumvent the plans of the United States food administration and defeat the aims of the fair-price committees.

There remains the question whether the three contesting defendants were so connected with the association or participated in the unlawful combination and acts to such an extent as to subject them to the penalties of the statute. The commissioner found that the letters of the president, Smithmyer, relating to salary and bonus of the secretary of the association, and also the correspondence between officers and managers of the defendant houses maintained by the Theo. Poehler Mercantile Company, did not come into the possession of the defendants, and that they had no actual knowledge of the letters.

First, as to the Samuel E. Lux, Jr., Mercantile Company: It appears to have been a member of the association, paid the assessments for maintaining it, the president attended meetings, took and read the bulletins of the secretary, as well as the reports made of the meetings. It appears further that President Lux wrote to secretary Sloan for two dozen of the percentage classifications made

by the association, and on the following day the secretary forwarded them to him, saying that they were the latest and the ones upon which all the jobbers in the territory were working.  Upon request of the secretary, the president of the company sent to the association a financial report as to the condition of his company.  When checked up by the secretary for not sending a report of his outstandings for a certain month, President Lux wrote that he had sent it yesterday, and he also assured the secretary that his company was always willing to coöperate.  Through the bulletins, the action taken in meetings of the association which the president of the company attended, and the published reports of action taken at meetings he did not attend, the company was informed as to the purposes of the association and the scope of its operations.  It combined with other members in carrying out the illegal purposes of the association and contributed money to further its plans and policies.  The commissioner's findings as to the liability of that defendant is approved.

The Pittsburg Wholesale Grocery Company was a member of the association for more than two years, and during that time paid assessments for its maintenance, making payments which aggregated $286.  It appears that the president of the company attended a number of meetings of the association and received bulletins sent out by Secretary Sloan.  He knew of the increase of the salary awarded to the secretary in consideration of the benefits that he had secured for the members, and the company paid it knowing the purpose for which it was being raised.  The president of the Pittsburg company denied knowledge of the bonus awarded the secretary for past services and denied combining or conspiring with anyone to restrain or monopolize trade.  His company was a member of the association from the beginning, and the evidence shows that he and other officers of his company must have known of the illegal purposes of the association and that they knowingly aided in carrying out those purposes contrary to public welfare and in violation of the statute.

The case of the H. D. Lee Mercantile Company differs from that of the other defendants, as it did not formally become a member of the association.  It received the bulletins of the association and necessarily learned of its plans and to some extent of the scope of its operations.  Assessments were paid by the company from time to time for a period of more than two years ending April 27, 1920,

and these amounted in all to $375. The payments were made at or about the time that assessments were paid by wholesale grocers that were regularly enrolled as members of the association. It is evident from the amounts paid that the Lee company did not pay assessments on the basis of the business done, and the amounts were not proportionate with those paid by some other grocers. A vice president and manager of the company attended one of the meetings of the association, and the testimony is that no representative of the company attended any other meeting. The vice president stated that he attended the meeting because he desired to hear a report that was to be made there by an officer of the federal food administration. In his testimony H. D. Lee said that he took the bulletins and paid for them, the same as he purchased and paid for other bulletins which conveyed information as to the state of the market, the conditions of business, and also because they contained information about the rulings of the federal authorities. He expressly denied that his company had intended to or in fact had ever joined with anyone in fixing a uniform standard of prices or the terms and conditions of sales of grocers or had done any act tending to restrain trade. He further stated that he did not receive the reports of meetings, but the bulletins contained reports of some of the meetings and also contained notices of future meetings, which indicated the business to be considered at such meetings. These bulletins revealed the purposes and operations of the association, and one reading them would be blind, indeed, that did not see that the design was to procure concert of action as to maintaining standard prices, obtaining certain discounts from manufacturers, fix uniform rates of discounts for cash on sales of groceries to retailers, and to stifle competition. With this knowledge the Lee company contributed money for the maintenance of the association and the carrying out of these purposes. The means for maintaining the association and promoting its purposes were derived from the assessments paid. Although the company did not subscribe its name on the membership roll or formally become a member, it actually became a part of the combination by its contribution and the help it rendered in furthering the plans of the combination. There is a claim that the contributions were personal to Secretary Sloan and were merely paid for the editorials contained in the bulletins; but it appears that when the association voted a bonus to the secretary and made a large increase in his salary, the Lee company increased

the amounts of its assessment as did the members and other supporters of the combination. The assessment paid by the Lee company at that time was double the amounts which it had previously paid. The fact that one of the unlawful combination which took part in the wrongful acts was not as active in furthering the unlawful scheme as others in the combination does not relieve that one from the consequences of the violation of the statute, nor will the fact that the combination did not effect a complete monopoly excuse the conspirators if that which was done tends to restrain trade and deprive the public of the benefits of free competition. (*The State v. Smiley,* supra; *The State v. Aikins,* 83 Kan. 792, 112 Pac. 605.)

Upon the testimony we conclude that while the H. D. Lee Mercantile Company did not enroll as a member of the association, it did form a part of the unlawful combination and substantially aided in furthering the prohibited acts which constitute a violation of the statute. No findings or conclusions were made by the commissioner as to the relative responsibilities of the several defendants or the penalties to be imposed and judgment to be rendered against these defendants, nor was any consideration given to this feature of the case in the briefs of counsel. It is now determined that the findings of the commissioner that each defendant acted in violation of the antitrust statute are approved, and the case is reserved for later consideration after the views of counsel have been presented as to what the ultimate judgment fixing the liabilities of the several defendants shall be.

BURCH, J. (dissenting): I dissent from the findings so far as they affect the H. D. Lee Mercantile Company and the Pittsburg Wholesale Grocery Company.

HOPKINS, J., not sitting.